Good morning. Good morning. Thank you, Your Honor. You can raise your lectern there if you want. There's a button down there to your right somewhere. Oh, right in the middle. Okay, thank you for your patience. You paid a lot of money. Well, you paid a lot of money as a taxpayer to get these to work. We want to use them. Okay. May it please the Court, opposing counsel, my name is Doug Anderson. I am the attorney for the State of North Dakota on this appeal. We're appealing the district court's reversal of a bankruptcy court judgment, determining that during the period relevant to this proceeding, account wagering was subject to taxation under North Dakota parimutuel horse racing legislation. This matter on appeal presents purely an issue of statutory interpretation applying the various canons of Let me interrupt right now. I assume that there's a very good answer, a reason why this was not certified to the North Dakota Supreme Court? Back in 2010, I made that motion to the bankruptcy court and it was denied at that time. So I did make that attempt. I should have read it more carefully, thank you. Okay. The first thing that went well anyway. You can always revisit that. Okay. Go ahead. Okay. So, again, the question is the interpretation of the parimutuel account wagering legislation. And within that context, the interpretation of what's called the takeout statute, as we've been referring to it, it's Section 5306.2-11 of the North Dakota Century Code. At the bankruptcy court level, the judge took the view that that statute did apply to account wagering. And he found that, of course, during that period of time, the account wagering was subject to taxation. In doing so, I think he made a little bit of a misunderstanding regarding account wagering versus simulcast wagering. And maybe I better back up to get to this point. Is that in 1987, at that time, the North Dakota Constitution had been amended to allow for games of chance. And I believe this court has recognized in the Susan Bala 2007 case that parimutuel wagering was a game of chance. But under the constitutional provision, which is Article 11, Section 3, it allows games of chance if the entire net proceeds go to a charity or essentially a public spirit organization. And so with this in mind, in 1987, the North Dakota legislature passed what's called live track race meets, the traditional form where people go to live race meets and place wagers. And in conjunction with that, they formulated what's called the takeout statute. Again, it provides how the proceeds from the wagering pool are to be distributed. And then in 1989, the legislature also approved what's called off track betting, which would be viewed at betting parlors through a simulcast televised system. And again, at that time, they revisited the takeout statute and put that language into the statute. So at that time, it referred to each date of live race meet or simulcast date. So from that time going forward, the takeout statute applied to all forms of parimutuel wagering. And again, parimutuel wagering includes both the live track race meets and the simulcast systems. Then we got to 2001, and legislation was passed to enable and authorize account wagering as another form of parimutuel wagering. And account wagering is a little bit different in that a person makes a deposit of money with, say, a service provider and then uses that money to make their wagers and from which they're paid. I think the bankruptcy court made the mistake of thinking that those were synonymous, that simulcast wagering and account wagering were one and the same, whereas sometimes it's hard to understand the distinction, but they're not. But nevertheless, in 2001, when account wagering was authorized, the takeout statute was not amended to include account wagering within the formula. The district court mentioned this too, but we have a rule that says, well, if the legislature has shown other places they know how to do it right or they know how to do it expressly, I don't know if there's a right or wrong here, but expressly, and then they don't do it, then that's evidence that they didn't intend to do it. So in other words, in the past, they'd done the takeout and they'd include the taxation language and the connection, but here they didn't. So why is that not a good statutory interpretation of the intent of the legislature? Well, as I've noted in my brief under North Dakota case law, again, the plain language is a basic premise and canon of statutory interpretation, but there are exceptions, and we believe the exception applies in this instance. And it goes back to Judge Hill's application. Even though he made a mistake in construing the simulcast to be account wagering, he did go back and rely on the absurdity doctrine, which is also recognized by the North Dakota Supreme Court. It states that the plain language rule applies unless there's an ambiguity, which is not an ambiguity, or if an absurd result applies. And that's what we believe happens in this instance. Do you argue there's an ambiguity here? I don't see that there's an ambiguity. I think maybe there was an ambiguity within the context of a confusion between the simulcast wagering and account wagering. I think there was a general misunderstanding between the two, even going back to— That's different. That's just misinterpreting it. But the language itself, or the lack of the tax language, do you think there's any ambiguity there? Or do we look at this, your other argument, which I think is it's an absurd result? I'm not going to rely on the ambiguity. I don't—I can't make a strong argument for ambiguity. I think it's absurdity, especially within the context of the constitutional limitation on games of chance under Article 11, Section 25. That's where the absurdity comes into play because, again, when you look at the takeout statute, it establishes a formula in the first instance where it says, in the simplest form of wagering, a one-horse race, it says, first of all, the licensee can deduct 20 percent of the wagering pool, and then 3 percent of that goes to the state for taxes. Then, later on, under Subsection 4, it talks about after paying qualifying expenses, which is defined elsewhere, it must provide the entire net proceeds to the charity. So that comes out of what's deducted under Subsection 1. So unless you have that in place, you may have account wagering authorized, but you can't implement it at all. I mean, if you don't have the takeout statute applied to account wagering, you don't have any authority for the licensee to withhold any money. There's nothing that can come out, let alone payment to the state, let alone payment to the charity. The licensee can't even retain any money. And even more so, there's a provision within there in that statute that says the remainder, which is the 80 percent, is paid to the better. So unless the takeout statute applies to account wagering, nothing comes in and nothing goes out. So under PWE's argument, yes, the state would not get the 3 percent, but even PWE would not have any authority to receive their 80 percent. So it leads to an absurd result. Are you, in effect, arguing that the statute in question doesn't express the legislature's true intent and that we should, in effect, amend the statute to express the true intent? Our argument is that there should be an applied amendment. Well, isn't that the argument that the Gilsteads made in their case and that Chief Justice VanderWaal and his colleagues rejected out of hand? Well, I think this is a little bit unique in that we have such a limited number... Was it the legislative oversight that resulted in this problem? I believe it was. And to get to that point, I'd have to be allowed to talk about the legislative history. And this is the point I want to get to, saying that there's an absurdity involved and at this point we're forced to look at the legislative history. Judge Erickson makes the comment, and he didn't cite anything to it, probably maybe the law, I don't know, but he said the North Dakota Constitution may not provide for implied taxes. As I recall, he didn't cite anything. I mean, that's what I wrote in my notes. Right. Is there any authority for that? In fact, if it is, it's pretty strong rationale that we can't... You're asking us to imply taxes, and if the North Dakota Constitution has been interpreted to say we don't imply taxes, then that may cut you off. But that statement is in his opinion, but I didn't see any authority cited for it. Right. I recognize that. And I read that, and I believe that he came up with that statement relying on the canon of construction that was stated in the Gould versus Gould decision. It goes back to the 1842 Wigglesworth decision that talks about if a statute is ambiguous or doubtful, it's construed in favor of the taxpayer, and you can't impose taxes by implication. But that's a canon of construction. I think they also bolstered it by relying on the constitutional provision under Article 10, Section 3, that says every tax has to be made in pursuance of law, which I understand to be is there has to be a legislative authorization. And then it continues to say, and it shall distinctly state the object of the tax. Well, our position is, yes, that may be the case, but once we imply the account wagering tax, then it does distinctly state the object. So we're trying to address the constitutional provision after we imply the account wagering into the taxation. Let me assume that both of you, well, assume that the other side is right, and you're right that the system doesn't operate because you can't sign any of the money to charity or to the debtor. Is that, instead of being the procedure and the relief for you to go after taxes, would it be just to shut down account wagering? Just to say, wait a minute, you can't do this because there's nothing provided in your account wagering statute to allow money to go to the charity or to the debtor. It doesn't fall under the takeout statute. Well, Your Honor, of course that was remedied in 2007. So was there a gap of six years when there should not have been an account wagering? Probably not. At this point, I don't know what the remedy is with the statute of limitations having been gone. I'm looking more at the remedy at the time. Wouldn't the remedy at the time, under your argument, have been to shut down the account wagering? Because takeout provision wasn't applicable, therefore they couldn't assign money to charities or to the debtors? Correct. Your Honor, if they had recognized that before this lawsuit was commenced, then it would have been appropriate to call an emergency session of the legislature to deal with it. Of course, at the time, everybody was reaping such wonderful rewards because within this context, you have to understand, we're not dealing with thousands of taxpayers. We're dealing with the state at one end, the team makers, the charitable organization. We're dealing with RSI, and we're really dealing with PWE as the high-volume debtor who has major stakes. So we're not dealing with a vast number of people. Everybody was happy at the time. The state was getting money to a certain point. I think I understand what you're saying. Okay. I'll give you one minute in rebuttal. Okay. Thank you. Good morning, Ms. Anderson. Good morning, Your Honor. I assume there's no relationship here between the two. No, Your Honor. It is a little amusing. What was that Gene Hackman movie where his daughter was on the other side? No, Your Honor, no relation. May it please the Court, Leanna Anderson, no relation, representing Apelli P.W. Enterprises, Inc. Your Honor, in this case, it is undisputed that there was no authority to a tax account wagering until 2007. Judge Erickson correctly found that when P.W. Enterprises was engaged in account wagering through RSI, there was neither legislative action directed at the collection of taxes for account wagering, nor was there specification as to the amount of tax. And there was nothing in the takeout statute prior to 2007 that would indicate that the state was authorized to collect taxes on account wagering activities. Mr. Anderson said it in his briefs, and you've also heard him say it here today, that the state admits that the takeout statute was amended at the same time that account wagering was created in 2001, but they did not create a tax on account wagering. The reason why Judge Erickson . . . Was my little scenario right? Was it a remedy they had at the time if they weren't all excited about this new wagering? That if the takeout provision didn't apply, they could have just shut it down? Because there was no provision relationship in the statutes to provide the money for the charity and the bettors? No, I disagree, Your Honor. And the reason that I disagree with that perspective is because we're not talking about the charity here. We're talking about taxes. And the state has come along and said, well, yes, but the charity might not have gotten any money. All the wagering would still need to be conducted through the charity. All the wagering was conducted through the charity. There was a whole other structure dealing with it. Yes, we are talking about all of the money. No, I'm not. I think they probably did do it all as if there was the takeout statute. They just didn't pay the taxes. But go ahead. It's a hypothetical that we're not dealing with, but go ahead. No, no, I understand, Your Honor, that they've raised this issue about the charity. And I think the distinction here is that, one, that we're not talking about any monies that are allegedly owed to the charity. The charity is not a party here. We're strictly talking about taxes. So it is purely hypothetical. And there is an argument that horse racing is not necessarily a game of chance underneath the Constitution because it is set forth in a separate provision of the North Dakota Century Code than games of chance, which are dealt with under 53-06.1, whereas horse racing is 53-06.2. It's under the sports and amusements title, along with things like the Skiing Responsibilities Act. So it's not entirely clear, but the important thing is here we're talking about taxes. What's important about Judge Erickson's opinion is that it's got multiple parts that we're missing from this tax. When you don't have a set law setting forth a tax, obviously you're missing the no tax levied except in pursuance of law. That's the constitutional requirement. You're also missing that the tax be specifically authorized by the legislature. And you're missing a third very important thing to this case. You're missing an amount and method of collection of the tax. So the state has asked that a tax be implied. But in order for a tax to be implied, there must not only be an implication of the tax itself, but also an implication of the amount of tax and the method of collection of tax. And that's what's impermissible in North Dakota under such cases as the Scott v. Donley case. Let me ask you something, First Jurisdiction. That is, do we have a final order here? Yes, Your Honor. The reason that I believe that we have a final order and that we agree with the state on this question is because all that is left to do in this case is set the amount of money that was for account wagering versus some other forms of wagering. The state contends that the full $5 million was not all for account wagering. And so it's just a matter of setting the amount. We agree that we're here on a dispute of law as to whether or not a tax existed. And that dispute of law, we've governed the proceedings down below in terms of just figuring out the amount. So we do believe it is a final decision. Going back to your immediately previous argument, how many words would we have to, in effect, have to say should be inserted in this statute to provide the relief that the state seeks? Would it be a relatively simple thing? No. I was inserting the word not, or or, or and. No, I don't believe it would be, Your Honor. What was well with it this way? What words were missing from the statute in question that should have been included? The statute in question doesn't in any way cover account wagering. So in order to have a tax— How many words would it take to imply that those words were intended to be there? You would have to add account wagering as a form of wagering that there was a tax applied to. And then— Simple enough, I would think. And then, Your Honor, you would have to set the rate on which account wagering was taxed. A mere calculation, a mere calculation based upon the prior statute. Well, in 2007, when the legislature finally added account wagering to the statute, they set account wagering at a completely different rate than the rest of wagering. Well, you could agree with me, but that's settled out among yourselves. That would be in nickels and dimes for you people. No, I disagree, Your Honor, because setting forth the amount and collection of the tax is a requirement. It's a constitutional requirement under the North Dakota Constitution. That's exactly what happened in the Scott v. Donley case. Why don't we get to the main issue, which— Let's see, how many rules of statutory construction do Justice Scalia and Professor Garner set forth? Is it 52? I'm glad you raised that book, Your Honor, because— Why shouldn't we apply the rule of statutory construction that makes some sense here? Your Honor, there's actually multiple questions in that question. The first is with respect to Brian Garner and Justice Scalia's book. The state mentions that book for the fact that it refers to the taxpayer statute. Yes, in footnote 19, I believe, is what they cite to. There is a different footnote in that very same section that says that there are still courts that are applying the law against the government. When it's a tax law, you construe it against the government and in favor of the taxpayer. And those courts that are still doing it are state courts. And in fact, North Dakota is one of those. So here in North Dakota, which is the law that applies, you still need to construe it. If it's a tax provision and it's ambiguous, you have to construe it against the government and in favor of the taxpayer. But that's assuming we get to the ambiguity, which would imply that there's a statute to begin with. So there has to be a statute to begin with, which is missing here. And then if it's ambiguous, then you imply it in favor of the taxpayer and against the government. And then, if Your Honor are inclined to look at legislative history, there has to be— Just a minute. Yes, Your Honor. Mr. Anderson is saying he kind of concedes there is no ambiguity. He's saying it's an absurd result. And that's how you get to the legislative history. Your Honor, I believe that you only get to an absurd result if you can show there's ambiguity. And the cases that deal with that do mention an absurd result, but you have to get the ambiguity first. And in the cases that go to the absurd result, there has to be clear legislative intent to tax. If this Court is inclined to look at the legislative history and we get to that point, then in addition to looking at the legislative history, the Court has to also look at all the circumstances surrounding the amendment of account wagering. And in this case, there's a few important facts to consider. First, each prior time that the legislature added a new form of wagering, they made a similar amendment to the takeout statute. In 1989, when they added off-track wagering, they similarly amended the takeout statute. In 1991, when they changed off-track wagering to rename it as simulcast, they amended the takeout statute. Here, they did not. In 2001, when the legislature added account wagering as a form of wagering, they changed the takeout statute, but not to amend account wagering. So they were already in there tinkering with the statute, didn't make that change. The legislature then had two additional times where they changed the takeout statute and neither time did they add account wagering, in 2003 and in 2005. It wasn't until 2007 that they added account wagering, and at that time, they set it at a different tax rate than the other forms of wagering. Next, there is a statement of legislative intent that the state has actually filed in this case. It's a one-sentence legislative intent. It's on page 67 of their opening brief, and it does not include any reference to tax or revenue. It just says that they're going to set up account wagering. And third, there still would be no amount for account wagering. There's nothing in the legislative history that sets forth the amount of tax for account wagering. So it's not just to apply the tax, but you have to go and create some sort of an amount. There's also the notice issue for a taxpayer. If a taxpayer wanted to know what they were taxed for account wagering, there'd be nothing at this time frame, prior to 2007, that they could look up and figure out how much they were going to be charged or have any notice of the charge or the amount or any of those things. And that's why courts don't allow, particularly in tax statutes, to go beyond the plain language, particularly here where we're not even dealing with a statute. Unless your honors have any more questions, I believe I'm finished. I guess not. I'm going to give you one of your minutes to Mr. Anderson. I think we're keeping it in the family. Mr. Anderson? Really, the court does appreciate giving time back. We always appreciate that. Mr. Anderson, I'll give you one minute. Okay, thank you. Ms. Anderson mentioned that the North Dakota Supreme Court has always maintained its position of the plain language rule, but I would quote from Amarada Hess Corporation, 704 NW 2nd 8, it's a 2005 case, and it's stated that the plain language rule, especially where it favors the taxpayer, may be oversimplified. It says, this statement does not mean any ambiguous. Of course, they're talking about ambiguous statutes. This statement does not mean any ambiguous statement must be strictly construed against the case, and we'll feel that's the case in this situation. The court went on to say, we conclude that the rule of strict construction of an ambiguous tax in favor of a taxpayer is a rule of last resort when other means of ascertaining the legislature's intents have failed. The state believes that when the court looks at the legislative history, which Ms. Anderson has referred to, they'll see that the intent was that this would be an income generating opportunity, and a statute for the state to incur more taxes. Your time's expired. Thank you, Mr. Anderson. Okay, thank you. We thank you both for your arguments, and we will get back to you as soon as we can. Thank you. We'll be in recess until 9 a.m. tomorrow morning.